DECISION
This matter is before the court on the Hynix's Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment, filed July 15, 2010. Plaintiff (Hynix) appeals its disqualification from enterprise zone exemption for three periods: 2006-2008, 2007-2009, and 2008-2010. (Am Compl at 1, 3.) The parties filed Stipulation of Facts on July 15, 2010. Defendants Lane County Assessor (County) and Department of Revenue (Department) filed cross motions for summary judgment. Oral Argument was held in the Tax Courtroom in Salem, Oregon on January 25, 2011. Richard G. Smith, Attorney for Plaintiff, appeared on behalf of Hynix. Marc Kardell, Assistant County Counsel, appeared on behalf of the County. Douglas M. Adair, Senior Assistant Attorney General, appeared on behalf of the Department.
 I. STATEMENT OF FACTS
Hynix received Enterprise Zone tax exemptions under ORS 285C.045 to 285C.255 for property identified as Accounts 1398088 and 5516511 (subject property) for the three three-year periods 2006-2008, 2007-2009, and 2008-2010. (Stip Facts at 1, ¶ 1.) "From 1998 until August, 2008, Hynix engaged, within the enterprise zone, in the business of providing goods, products or services to businesses or organization through activities including, but not limited to, *Page 2 
manufacturing, assembly, fabrication, processing, shipping or storage." (Id. at 3, ¶ 8.) "On or about August 6, 2008, Hynix employment was reduced by more than 85%." (Id. at 2, ¶ 3.) "As of December 31, 2008, Hynix employed 36 individuals within the zone, primarily to assist with the process of transitioning the facility from a fully operational status to a status in which the building and equipment could be maintained and the value preserved for possible future use or sale. * * * Most of the manufacturing equipment remained connected[.]" (Id. at 3, ¶ 9.) After December 31, 2008, "most of the manufacturing equipment" was disconnected. (Id. at 3, ¶ 9.)
"On or about March 31, 2009, Hynix caused to be hand delivered to [the County] a document entitled `Notification of Enterprise Zone Disqualification,' * * * [which stated] that Hynix announced on July 23, 2008[,] that it will be `closing its facility located in West Eugene[.]'" (Id. at 2, ¶ 4.) That letter indicated that it was Hynix's "notice of disqualification" required by ORS 285C.240 because Hynix had "substantially curtailed employment below what is required to maintain eligibility in the Oregon Enterprise Zone program." (Id.) In response, the County disqualified Hynix's 2006-2008, 2007-2009, and 2008-2010 exemptions. (Id. at 2, ¶ 5.) As of March 31, 2009, "Hynix employed 26 employees within the zone[.]" (Id. at 3, ¶ 9.) "The clean room environments [were] maintained." (Id.)
"Prior to the suspension of manufacturing operations on August 6, 2008," Hynix evaluated the feasibility of using the site "for manufacturing photovoltaic products." (Id. at 4, ¶ 10(a).) "Beginning in June 2008, Hynix engaged in negotiations for a joint venture relationship pursuant to which photovoltaic modules would be manufactured at the site by Hynix and a joint venture partner." (Id. at 4, ¶ 10(b).) As of December 31, 2008, Hynix had a number of options with respect to the facilities, "including the resumption of production of semiconductor products [and] the production of photovoltaic products[.]" (Id. at 4, ¶ 10(d).) *Page 3 
Between September 2008 and December 2008, Hynix incurred approximately $17 million in expenses related to its employment of individuals and maintenance of equipment within the zone. (Id. at 4, ¶ 10(e).)[1]
"Hynix had previously reduced employment within the enterprise zone in 2001. In 2002, Hynix agreed with the County and the City of Eugene that it would receive a 3-year exemption nonetheless, provided that certain payments in lieu of taxes be made into an escrow account." (Id. at 2-3, ¶ 7.) That agreement stated that `(a)t the end of the exemption period, if Hynix has fulfilled all the conditions set forth in this section, Hynix shall receive the balance of funds in the escrow account. If Hynix has failed to meet any of these conditions, the County and the City shall receive the funds in the escrow account based on (certain criteria).'" (Id.)
 II. ANALYSIS
Hynix acknowledges that a "substantial curtailment" occurred on August 8, 2008, but maintains that "the effective date of the substantial curtailment was after the 2006-2008 [enterprise zone] period, so there would be no loss of the exemption for any year in that exemption period." (Hynix's Br in Support of Mot for Summ J, or in the Alternative for Partial Summ J (Hynix's Br) at 2.) Hynix maintains in the alternative that, "`closure' did not actually occur in 2008" and Hynix is, therefore, entitled the one-year "in lieu" payment provision provided in ORS 285C.240(6)(a). (Id. at 2-3.)
"With respect to the 2007-2009 [] exemption period, Hynix also claims the benefit of the one-year limited loss of the exemption." (Hynix's Br at 3.) Hynix maintains that "there was still substantial activity at the plant during [2009] and not a complete closure of the facility." (Id.) *Page 4 
Hynix also notes that "there was every hope that operations would be resumed at some point[,]" either "from resumption of production of semi-conductor products, the production of photovoltaic products, or for some other use[.]" (Id. at 4.) "Hynix concedes that there is no eligibility for the [2008-2010] exemption * * * period." (Hynix's Br at 12.)
A. Issues
There are two issues before the court. First, the timing of disqualification:
 "Whether a suspension of manufacturing activities in the third year of a three-year exemption disqualifies a taxpayer for the enterprise zone exemption, where the suspension occurs in the latter half of the third assessment year, after the time for certifying the taxpayer's employment figures pursuant to ORS 285C.210, and when the required notice of disqualification is not due until after the three-year period expires."
(Hynix's Reply to Defs' Resp to Hynix Mot for Summ J and Resp to Defs' Mot for Summ J (Hynix's Reply) at 1.) At oral argument, the Department characterized the issue as whether a disqualifying event in the third year of a three-year enterprise zone period results in disqualification of all three years and requires assessment of additional tax for all three years.
The second issue concerns the availability of the one-year "in lieu" payment provision in ORS 285C.240(6). Hynix summarized that issue as:
 "Whether Hynix is eligible for the one-year `in lieu' payment of taxes referenced in ORS 285C.240(6). The sub-issues here are whether Hynix had `closed its operations' in a way that would prevent it from qualifying under this statute, and whether it otherwise is ineligible because it did not make the one-year tax payment by the date identified in the Department's rule and because it made payments to only one of the zone sponsors (Lane County) and not to both zone sponsors."
(Hynix's Reply at 1-2.) The Department summarized the second issue as whether Hynix closed its operations in 2008 thereby making it ineligible for the one-year "in lieu" payment in ORS 285C.240(6) and, even if Hynix was qualified to make an "in lieu" payment, whether it did so. *Page 5 
B. Statutory Interpretation — Overview
Summary judgment is governed by Tax Court Rule (TCR) 47 C, which states in part:
 "The court shall grant the motion if the pleadings, depositions, affidavits, declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."
"In interpreting a statute, the court's task is to discern the intent of the legislature." PGE v. Bureau of Labor andIndustries (PGE), 317 Or 606, 610, 859 P2d 1143 (1993); ORS 174.020.[2] Legislative intent is determined first from the text and context of the statute. PGE, 317 Or at 611;State v. Gaines (Gaines),346 Or 160, 171, 206 P3d 1042 (2009). "In trying to ascertain the meaning of a statutory provision, * * * the court considers rules of construction of the statutory text that bear directly on how to read the text. Some of those rules are mandated by statute, including * * * the statutory enjoinder `not to insert what has been omitted, or to omit what has been inserted.'" PGE, 317 Or at 611, citing ORS 174.010. "[W]ords of common usage typically should be given their plain, natural, and ordinary meaning." PGE,317 Or at 611. "[T]he context of the statutory provision at issue * * * includes other provisions of the same statute and other related statutes." Denton and Denton,326 Or 236, 241, 951 P2d 693 (1998).
"[A]fter examining text and context," the court may consider legislative history that "appears useful to the court's analysis."Gaines, 346 Or 172; see also ORS 174.020(3) (stating that "[a] court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers appropriate"). "If the legislature's intent remains unclear after examining text, context, *Page 6 
and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." Gaines, 346 Or at 172.
When analyzing an exemption statute, the court is guided by the principle that taxation is the rule and exemption from taxation is the exception. Dove Lewis Mem. Emer. Vet. Clinic v. Dept. ofRev., 301 Or 423, 426-27, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. SWOregon Pub. Def. Services v. Dept. of Rev.,312 Or 82, 88-89, 817 P2d 1292 (1991). "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." North Harbour Corp. v. Dept. ofRev. 16 OTR 91, 95 (2002).
C. Disqualification from exemption under ORS 285C.240
ORS 285C.240 addresses disqualification from enterprise zone exemption, stating in part:
 "(1) The county assessor of any county in which an enterprise zone is situated or the sponsor shall be notified in writing by the qualified business firm * * * not later than July 1 following the assessment year for which the exemption is claimed and in which one of the following events occurs:
 "(a) Property granted exemption from taxation under ORS 285C.175 is sold, exchanged, transported or otherwise disposed of for use outside the enterprise zone or for use by an ineligible business firm;
 "(b) The qualified business firm closes or so reduces eligible operations that the reduction constitutes a substantial curtailment of operations under ORS 285C.210, unless a substantial curtailment of operations is permitted under ORS 285C.200 (2);
 "(c) The qualified business firm fails to meet any of the qualifications required under ORS 285C.200; *Page 7 
 "(d) The qualified business firm fails to meet any condition that the firm is required to satisfy under ORS 285C.150, 285C.155 or 285C.205 or any term of an agreement entered into with the sponsor under ORS 285C.160 with which the firm had agreed to comply;
 "(e) The qualified business firm uses the property to conduct activities in the enterprise zone that are not eligible activities; or
 "(f) Property of the qualified business firm for which exemption under ORS 285C.175 is claimed ceases to be qualified property under ORS 285C.180.
 * * * * *
 "(3)(a) When an assessor receives written notice under subsection (1) or (2) of this section, the assessor shall disqualify the property for the assessment year following the disqualifying event and 100 percent of the additional taxes calculated under ORS 285C.175 shall be assessed against the property for each year for which the property had been granted exemption under ORS 285C.175.
 "(b) Notwithstanding paragraph (a) of this subsection, if a qualified business firm fails to meet any of the requirements of an agreement entered into by the firm under ORS 285C.160 during the exemption, but meets all other applicable requirements under ORS 285C.050 to 285C.250 during the first three years of the exemption, the qualified property of the firm may not be disqualified during the first three years of exemption for failure to comply with the requirements of the agreement entered into under ORS 285C.160.
 "(c) The additional taxes assessed under this subsection shall be reduced by the amount, if any, paid by the qualified business firm to the sponsor under subsection (6) of this section for the same property."
The County disqualified the subject property under ORS 285C.240(1)(b). (Stip Ex C.) ORS 285C.240(1)(b) identifies two possible bases for disqualification: "closes or so reduces eligible operations that the reduction constitutes a substantial curtailment of operations[.]" The court begins with "substantial curtailment" because that was the parties' primary focus. *Page 8 
1. "Substantial curtailment" under ORS 285C.240(1)(b) and285C.210.
To define "substantial curtailment," ORS 285C.240(1) refers to ORS 285C.210, which states in pertinent part:
 "(1) For purposes of ORS 285C.175, 285C.200 and 285C.240, operations of a business firm are substantially curtailed when:
 "(a) The number of employees of the firm within the enterprise zone is reduced by more than 85 percent from the highest number of employees of the firm within the enterprise zone;
 "(b) The number of employees of a firm within the enterprise zone has been reduced by more than 50 percent from the highest number of employees of the firm within the enterprise zone for a period of time that is equal to or more than nine months; or
 "(c) The annual average number of employees within the enterprise zone during the first assessment year for which the exemption under ORS 285C.175 is granted, or any subsequent year in which an exemption is claimed, is reduced below the greater of:
 "(A) The annual average number of employees of the business firm within the enterprise zone, averaged over the 12 months preceding the date of the application for authorization, plus one employee; or
 "(B) 110 percent of the annual average number of employees of the firm within the enterprise zone, averaged over the 12 months preceding the date of the application for authorization.
 "(2) For the purposes of this section:
 "(a) The number of employees of a firm within the enterprise zone is the employment of the firm, as defined in ORS 285C.200, on the earlier of the date a claim for exemption is filed under ORS 285C.220 or April 1, of each assessment year for which an exemption under ORS 285C.175 is claimed, and for the year immediately following the last assessment year for which an exemption is claimed."
Hynix points to the language in ORS 285C.210(2)(a) defining "[t]he number of employees" and concludes that, "for the 2008 assessment year, the statute requires a comparison *Page 9 
of the number of employees (i) as of either the date of filing the claim, which was early in 2008, or April 1, 2008, with (ii) the highest number of employees in the firm." (Hynix's Br at 16 (footnote omitted).) Hynix notes that "[i]t is undisputed that the number of employees was not reduced to the `substantial curtailment' level until August, 2008. Thus, for 2008, there was not a substantial curtailment as of early 2008 — the date on which the determination is to be made — and for the 2008 assessment year." (Id.) (See also Hynix's Reply at 3.) Hynix provided timely notice of a "substantial curtailment" on March 9, 2009. Hynix concedes that the disqualification as a result of its "substantial curtailment" was effective for any open exemption periods as of the required date of notice, April 1, 2009; here, the 2007-2009 and 2008-2010 exemption periods.
The Department interprets ORS 285C.210(2) as determining employment "under two circumstances: the assessment years for which exemption is claimed and the year after the last year for which exemption is claimed." (Department's Reply on Cross Mot for Summ J (Department's Reply) at 2). The Department argues that, under ORS 285C.240(1),
 "a disqualifying event such as a substantial drop in employment can occur during any assessment year in which the exemption is claimed, [so] there must be a mechanism for determining employment levels for the last assessment year of exemption. Thus, the latter portion of ORS 285C.210(2) refers to `the year immediately following the last exemption year for which an exemption is claimed.' There is no date specified, so such an employment level could be as of January 1 or any subsequent date."
(Id. at 2-3.)
Hynix responds that the legislature could have required reporting of employment on December 31 of each year to determine the number of employees. Hynix asserts that it is reasonable that a taxpayer couldnot have a loss of exemption in the third year, at least after establishing the "number of employees" on April 1 or when the claim is filed. *Page 10 
a. Text
The text of the statute is the starting point of the analysis as well as the best evidence of the legislature's intent. PGE,317 Or at 610. When the legislature has explicitly defined a term, that definition must be examined first. State v. Couch
(Couch), 341 Or 610, 617, 147 P3d 322 (2006). The court is "obliged to apply the legislature's definition."Id. at 619. Words used within a statutory definition are to be given their "`plain, natural, and ordinary meaning.'"Id. at 618, citing PGE, 317 Or at 611.
ORS 285C.240(1)(b) explicitly refers to ORS 285C.210 to provide the definition of "substantial curtailment" and the court is "obliged to apply the legislature's definition." The parties do not dispute that Hynix's operations were "substantially curtailed" under ORS 285C.210(1)(a). The parties do, however, dispute the appropriate interpretation and applicability of ORS 285C.210(2). By its terms, ORS 285C.210(2) applies "[f]or the purposes of this section [ORS 285C.210]" and provides the definition of "number of employees." Again, the court is obliged to apply the legislature's definition. ORS 285C.210(2)(a) defines the "number of employees of firm within the enterprise zone" as "the employment of the firm, as defined in ORS 285C.200, on the earlier of the date a claim for exemption is filed under ORS 285C.220 or April 1, of each assessment year for which an exemption under ORS 285C.175 is claimed[.]"[3]
Based on the text of ORS 285C.210, the court agrees with Hynix that, "for the 2008 assessment year, the statute requires a comparison of the number of employees (i) as of either the *Page 11 
date of filing the claim, which was early in 2008, or April 1, 2008, with (ii) the highest number of employees in the firm." (Hynix's Br at 16 (footnote omitted).) "It is undisputed that the number of employees was not reduced to the `substantial curtailment' level until August, 2008. Thus, * * * there was not a substantial curtailment as of [April 1, 2008] * * * and for the 2008 assessment year." (Id.)
b. Context
Statutory context includes "historical background" and "related statues." State v. Perry, 336 Or 49, 54, 77 P3d 313 (2003). The historical background of a statute may include the "sequence of legislation" affecting the statute at issue. Id. at 55. "In a serially amended statute * * * the wording changes adopted from session to session are a part of the context of the present version of the statue being construed." Krieger v. Just
(Krieger), 319 Or 328, 336, 876 P2d 754 (1994). The context of a statute may include statutory predecessors, even if those predecessor statutes have different ORS numbers than the statute at issue. Strunk v. PERB,338 Or 145, 186-87, 108 P3d 1058 (2005). Based on a change in a word or words, the court may infer a legislative intent to change the meaning or scope of a statute. See, e.g., Carrigan v. State FarmMutual Auto. Ins. Co.,326 Or 97, 103-104, 949 P2d 705 (1997) (determining that the legislature intended to broaden the scope of a statute based on its removal of limiting language).
This case involves construction of a "serially amended statute." In 1989, the definition of "substantially curtailed" was included within the same provision as disqualification:
 "(a) Operation of a new business shall be considered to be substantially curtailed when the number of employes is reduced at the end of a calendar year by more than 85 percent from the highest number of employes at the end of any calendar year during which the business firm received a property tax exemption under section 14 of this Act * * *. *Page 12 
 "(b) Operation of an existing business shall be considered to be substantially curtailed when the number of employes is reduced at the end of a calendar year below 100 percent of the number of employes at facilities of the firm located within the enterprise zone at the end of the year preceding the first tax year for which the exemption is granted."
Or Laws 1989, ch 1015, § 21(3) (emphasis added).
In 1991 and 1993, the references to "calendar year" were changed to "tax year." Or Laws 1991, ch 415, § 2; Or Laws 1993, ch 25, § 15. In 1997, the distinction between "new" and "existing" business was removed. Or Laws 1997, ch 835, § 26. Also in 1997, the reference to "tax year" was changed to "assessment year." Or Laws 1997, c 541, § 425.
In 2003, the definition of "substantially curtailed" was removed from the statutory provision addressing disqualification and appeared in its current form. See Or Laws 2003, ch 662, § 46 (deleting the definition of "substantially curtailed") and § 40 (adding a new statute defining "substantially curtailed"). Subsection (2) defining the "number of employees" appeared for the first time in the 2003 amendments.
Hynix noted that the legislature could have required reporting of employment on December 31 of each year to determine the number of employees. Prior to 2003, the number of employees for purposes of determining substantial curtailment was specifically measured by the number of employees at the end of "a calendar year" (1989), "a tax year" (1993), and "an assessment year" (1997). The reference to "the end of an assessment year" was removed in 2003 at the same time that the subsection defining "the number of employees" was added. Absent any additional information, the 2003 amendments support Hynix's position that, for purposes of determining whether substantial curtailment has occurred, the "number of employees of a firm" is measured "on the earlier of the date a claim for exemption is filed under ORS 285C.220 or April 1, of each assessment year for which an exemption under ORS 285C.175 is claimed." *Page 13 
c. Legislative history
The parties did not provide any legislative history. As suggested by the serial amendments to the statutes at issue, the legislative history of the Enterprise Zone exemption program in Oregon is lengthy and complicated, the applicable statutes having been amended during every legislative session between 1989 and 1999, as well as in 2003. In its review of the legislative history of ORS 285C.240 (formerly 285B.728, 285.617, and 284.280) and 285C.210, the court did not discovery any legislative history directly addressing the purpose for the 2003 amendment to the definition of "substantially curtailed."
At a House Trade and Economic Development Committee hearing on February 24, 2003, Mike Burton (Burton), Assistant Director of the Economic and Community Development Department, testified concerning HB 2299, amending the Enterprise Zone Act (Act). He testified that HB 2299 contained a few substantive changes to the Act, but most of the changes were simply "a reinsertion of a piece" removed from elsewhere in the Act. He testified that the primary purpose of HB 2299 was to reorder the Act for greater clarity by collecting all pertinent laws in one chapter. Burton's testimony focused on what he considered to be "substantive changes." He did not mention the change in the definition of "substantially curtailed."
The legislative history of HB 2299 provides little assistance in interpreting ORS 285C.210 and its relationship to ORS 285C.240. The court concludes that the "substantial curtailment" under ORS 285C.240(1)(b) and ORS 285C.210 was not effective until 2009.
2. Closure under ORS 285C.240
A question remains whether Hynix "close[d]" in 2008 within the meaning of ORS 285C.240(1)(b). The term "close" is used twice in ORS 285C.240 and both uses of the term are critical to the outcome of this case: First, in the previously identified language in ORS 285C.240(1)(b); *Page 14 
and, second, in the "in lieu" payment provision under ORS 285C.240(6), which includes the phrase "closed its operations." Because both subsections of ORS 285C.240 include a form of the verb "close" and a reference to "operations," the court will consider the parties' arguments concerning whether Hynix "closed its operations" in 2008 within the meaning of ORS 285C.240(6) to aid in interpreting both subsection (1)(b) and subsection (6).
Hynix characterizes closure as a "process" and argues that the disqualification statute supports that interpretation insofar as it "contemplates a time period and a process between suspension of manufacturing and a total closure" based on the distinction between substantial curtailment and closure. (Hynix's Br at 8; Hynix's Reply at 9 (emphasis omitted).) According to Hynix, the process of closing a facility is a "business operation": "Manufacturing plants have start-up phases; they have production phases; and they have phases where a closure process is implemented. * * * During all of these phases, thebusiness operation is still ongoing even though the facility may be relatively inactive." (Hynix's Reply at 8 (emphasis in original).)
Hynix characterizes its activities post-August 2008 as "the beginning of a potential closure process" and "an evaluation of changes in the manner in which the facilities might be used." (Id.) Hynix argues that Defendants focus too much "on the narrow operation of the facility rather than the business." (Id.) Hynix highlights the fact that, as of December 31, 2008, it retained 36 employees who were "maintaining the operational capability of the plant." Hynix notes that many steps are required to close a facility in order to comply with state and federal environmental and safety requirements. (Hynix's Reply at 8-9.)
a. Text
If a word is not defined by statute and is a word of common usage (as contrasted with a term of art) courts typically give that word "its plain, natural, and ordinary meaning." See *Page 15 State v. Murray, 343 Or 48, 52 162 P3d 255 (2007) (referring toWebster's Third New Int'l Dictionary to define the term "cause"); see also Potter v. Schlesser Co., Inc.,335 Or 209, 213, 63 P3d 1172 (2003) (referring to Webster's ThirdNew Int'l Dictionary to define the term "lien"). In selecting the appropriate dictionary definition from many, the court may consider the term at issue in the context of the statutory provision. SeeCouch, 341 Or at 618 (selecting "the most sensible meaning" from the possible definitions).
The term "close" is not defined in ORS 285C.045 to 285C.255, so the court looks, first, to the "plain, natural, and ordinary meaning" of that term in Webster's Third New InternationalDictionary (Webster's) (unabridged ed 2002). It is not clear from the text of ORS 285C.240(1)(b) whether the term "closes" refers to "eligible operations" because the terms are separated by the phrase "or so reduces"; it is possible that ORS 285C.240(1)(b) refers to a situation in which a firm "closes" rather than "closes * * * eligible operations." Given that ambiguity, the court will consider definitions of "close" as both a transitive and intransitive verb.
Webster's provides numerous definitions of "close" as a transitive verb. The most relevant definitions are as follows: "1 * * * f (1): to suspend or stop the services, sessions, or operations of * * * (2): to force to discontinue or end a business enterprise" and "3 a: to bring to an end or period: shut off or preclude further continuation of[.]"Webster's at 426. The most relevant definitions of "close" as an intransitive verb are: "1 * * * b: to cease operation * * *: discontinue institutional activities * * * c: to suspend business or end the business day[.]" Id. The relevant definitions of "close" all refer to the cessation or suspension of business operations or activities, providing support for the interpretation that "closes" refers to "eligible operations." *Page 16 
b. Context
"Statutory context `includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the law was enacted.'" Dept. of Transportation v. Stallcup
(Stallcup), 341 Or 93, 99, 138 P3d 9 (2006), citing Dentonand Denton, 326 Or 236, 241, 951 P2d 693 (1998). The court may rely on related statutes to ascertain the scope of a particular term. See State v. Werdell (Werdell),340 Or 590, 596-97, 136 P3d 17 (2006) (referring to the purpose of related provisions to determine meaning of term "discovery" in a statute defining the crime of hindering prosecution).
The context provided by the other subsections of ORS 285C.240(1) also supports the interpretation that a firm is disqualified when it closes eligible operations. ORS 285C.240(1) is written broadly, identifying numerous situations in which a business firm must give notice that a disqualifying event has occurred. The various situations triggering disqualification described in ORS 285C.240(1) support the Department's position that "[q]ualification and disqualification for enterprise zone exemption are effectively two sides of the same coin." (Department's Cross Mot for Summ J and Resp (Department's Cross Mot) at 10.) Subsection (a) requires disqualification when exempt property is transferred outside the enterprise zone or to an ineligible business firm. Subsection (c) refers to the situation in which the qualified firm fails to meetany of the requirements of ORS 285C.200 (describing the qualifications required for property of a qualified business firm to receive exemption). Subsection (e) refers to the situation in which the business firm uses the property to conduct ineligible activities in the enterprise zone. As in Werdell, the context provided by the other disqualifying events identified in ORS 285C.240(1) suggests that disqualification occurs whenever a business firm fails to meet the requirements for exemption, including closure of its eligible business operations. *Page 17 
The parties agree that, after August 2008, Hynix no longer engaged, within the enterprise zone, in the business activities for which it received enterprise zone exemption: manufacturing, fabricating, and shipping semi-conductors. Hynix's activities after August 2008 consisted of preserving the operational capacity of the facility and considering other possible uses of the subject property. Hynix does not contend that its activities after August 2008 would have qualified as eligible activities for enterprise zone exemption. Because Hynix no longer engaged in "eligible operations" after August 2008, the court concludes that Hynix "closed" within the meaning of ORS 285C.240(1)(b).
D. Timing of disqualification
Hynix argues that "the notice was given on a timely basis on March 31, 2009, after the August 8, 2008[,] suspension of production. However, by that time, the three-year period for which the exemption was available had already expired." (Hynix's Br at 15.) Essentially, Hynix argues that "the disqualifying event [was] effective only in 2009" and, therefore, "the taxpayer was qualified for the exemption in 2006-2008." (Id. at 15-16 (emphasis in original).)
The Department notes that "[t]he phrase `had been granted exemption' [in ORS 285C.240(3)(a)] is in the past perfect tense and necessarily refers to years for which exemption had already been granted, e.g., the current and prior tax years." (Department's Cross Mot at 12.) The Department argues that "the act of assessing the additional taxes for prior years upon notification of a disqualifying event is disqualification of the property from exemption in those prior years" and that that interpretation is "consistent with the overall * * * exemption scheme which contemplates * * * exemption for the full three year period in return for full compliance for that time period." (Id. at 11.) *Page 18 
Hynix provided timely notice under ORS 285C.240(1) and the County disqualified the subject property pursuant to ORS 285C.240(3). The court agrees with the Department that "[t]he phrase `had been granted exemption' [in ORS 285C.240(3)(a)] * * * necessarily refers to years for which exemption had already been granted, e.g., the current and prior tax years." (Departments Cross Mot at 12.) The disqualifying event here occurred in 2008 and the assessment year following 2008 is 2009. Thus, the disqualification in the 2009 assessment year refers back to the 2008 disqualifying event and requires assessment of additional taxes calculated under ORS 285C.175 for all years for which the property had been granted exemption. In this case, all three exemption periods (2006-2008, 2007-2009, and 2008-2010) were open in 2008 and are, therefore, disqualified as a result of Hynix's closure in 2008.
E. Availability of "in lieu" payment under ORS 285C.240(6)
ORS 285C.240(6) allows a one year, "in lieu" payment so long as the business firm has not "closed its operations." ORS 285C.240(6) states:
 "(a) Notwithstanding subsections (3) and (5) of this section, if an assessor or sponsor receives notice from a business firm under subjection (1)(b), (c), or (d) of this section and the qualified business firm has not closed its operations, the qualified business firm shall pay the sponsor an amount equal to the property taxes for the qualified property in the assessment year for which the exemption is claimed in lieu of the amounts otherwise due under subsection (3) of this section.
 "(b) Moneys collected under paragraph (a) of this subsection shall be used by the sponsor to benefit the residents of the enterprise zone and for the development of jobs, skills and training for residents of the enterprise zone and the zone's immediate vicinity.
 "(c) This subsection applies only to the first notice given by the business firm under subsection (1)(b), (c) or (d) of this section.
 "(d) If the sponsor does not receive the full amount to be paid by the qualified business firm under paragraph (a) of this subsection, the assessor shall disqualify the property and impose the entire amount of additional taxes as prescribed under subsection (3) of this section." *Page 19 
The Economic and Community Development Department, [4] pursuant to authority provided by ORS 285C.060(1), promulgated an Oregon Administrative Rule (OAR) concerning the applicability of ORS 285C.240(6). That rule states, in pertinent part,
 "For purposes of ORS 285C.240(6), a qualified business firm's avoidance of disqualification through payment of the firm's enterprise zone tax savings for one year is allowed, only if:
 * * * * *
 "(3) The firm maintains the business operations, for which the qualified property was being used or occupied, unless the firm can demonstrate that any discontinuation (shutdown) is only temporary[.]"
OAR 123-065-4960.[5]
1. Parties' arguments
Having previously interpreted the term "close," the court focuses on "operations" within the meaning of ORS 285C.240(6). Hynix contends that the process of closing a facility is a "business operation" and, even during that process, "the business
operation is still ongoing even though the facility may be relatively inactive." (Hynix's Reply at 8 (emphasis in original).)
The County argues that "discontinuing production, when the eligible enterprise zone activity is that very same production, is discontinuing the operation that the statute sought to reward with a tax exemption. It is not when the door is locked, it is when the eligible operations cease." (County's Mem in Support of Lane County Assessor's Mot for Summ J and in Resp to Ptf's Mot for Summ J or Partial Summ J (County's Mem) at 3 (footnote omitted) (emphasis in original).) The County cites Webster's definition of "operations" as "`a doing or performing esp of action,'" arguing that "[c]losure of operations is not limited to ending of production (as not *Page 20 
every eligible activity involves production.) But closure of operations does mean the ending of the activity, asWebster's clearly points out." (Id. at 3, 4.)
In defining the term "operations" the Department refers to the context, including "other provisions of the same statute and other related statutes" and concludes that "the `operations' referred to * * * can be no less than the operations which would qualify a business firm in the first place [identified in ORS 285C.135[6], otherwise we are faced with the illogical result that an unqualified business firm could continue in the enterprise zone program." (Department's Cross Mot at 17 (citation omitted).) The Department argues that OAR 123-065-4960 supports the interpretation that "operations" in the in lieu provision means "`the business operations for which the qualified property was being used or occupied.'" (Id. at 22 (footnote omitted).) The Department notes that the qualifying activities listed by Hynix on all of its applications were "manufacturing, fabrication, and shipping." After August 2008, Hynix ceased to engage in those qualifying activities and engaged primarily in what the Department characterizes as "property management," which is specifically listed as a non-qualifying activity under ORS 285C.135(b)(2); *Page 21 
Hynix would not have qualified as an eligible business firm based on its activities after August 2008. (Id. at 18-19.)
2. Text
The term "operations" is not defined in ORS 285C.045 to 285C.255.Webster's provides numerous definitions of "operations," the most relevant of which are: "1 a obs: a doing or performing esp. of action"; "2 * * * b: the quality or state of being functional or operative — usu. used with in orinto"; and "9 * * * b: the whole process of planning for and operating a business or other organized unit * * *c: a phase of a business or of business activity[.]"Webster's at 1581. The court notes that the County offers the first definition ("a doing or performing esp. of action") in its interpretation of ORS 285C.240(6). (County's Mem at 3.)
3. Context
The Oregon Supreme Court has also determined that relevant administrative rules in existence at the time the conduct at issue occurred "provide relevant context to aid in our interpretive task."Stallcup, 341 Or at 102. As discussed previously, other provisions of the same statute and related statutes provide context.Id. at 99-100 (considering ORS chapter 674 which "regulates the practice of real estate appraisal activity within Oregon" for context in interpreting the term "appraisal"). "When the legislature uses the identical phrase in related statutory provisions that were enacted as part of the same law, we interpret the phrase to have the same meaning in both sections." Tharp v. PSRB,338 Or 413, 422, 110 P3d 103 (2005), citing PGE, 317 Or 611. In the absence of evidence suggesting that a phrase has a different meaning in related statutes, the court will conclude that the phrase has the same meaning. Id.
The court agrees with the Department that the context provided by the applicable administrative rule and related statutes in ORS chapter 285C support the interpretation of *Page 22 
"operations" in ORS 285C.240(6) as referring to the operations that would qualify a business firm in the first place, identified in ORS 285C.135. OAR 123-065-4960 requires a business firm to continue its qualifying operations in order to receive the benefit of the "in lieu" payment provision and provides compelling evidence that the term "closes its operations" in ORS 285C.240(6) refers to a business firm's suspension of its qualifying business activities.
The term "operations" is used throughout ORS chapter 285C; it appears at times alone and at other times modified by the terms "eligible," "business," or both: ORS 285C.240(1)(b) identifies closure or reduction of "eligible operations" as an occurrence resulting in disqualification; ORS 285C.140(6)(a) requires the sponsor and county assessor to authorize a business firm if, amongst other things, "[t]he current or proposed operations of thebusiness firm in the enterprise zone result in the firm being eligible under ORS 285C.135;" and ORS 285C.200(1)(a) requires that a firm be "engaged in eligible business operations" in order to qualify for exemption. (Emphasis added.) The inconsistent use of the term "operations" in ORS chapter 285C suggests that different uses might have different meanings; "eligible business operations" may have a different meaning than simply "operations."[7]
Nevertheless, the best evidence of the meaning of "operations" in ORS 285C.240(6) is OAR 129-065-4960, which refers to "the business operations, for which the qualified property was being used or occupied."
Hynix argues that the rule OAR 129-065-4960 "acknowledges that business `operations' are continuing during a temporary shutdown; they are also continuing during the closure process." (Hynix's Reply at 9-10.) The court disagrees. OAR 129-065-4960 does not suggest *Page 23 
that eligible business operations continue during a "discontinuation" or "shutdown"; rather, it creates the possibility of relief under ORS 285C.240(6) in a situation in which the business firm can "demonstrate that any discontinuation (shutdown) is only temporary."
Based on OAR 129-065-4960, the term "operations" in ORS 285C.240(6) means "the business operations, for which the qualified property was being used or occupied[.]" Because Hynix did not engage in "the business operations, for which the qualified property was being used or occupied" after August 2008, the court concludes that Hynix "closed its operations" within the meaning of ORS 285C.240(6).
4. Temporary closure
Hynix argues that "the cessation of manufacturing that occurred in August 2008, could have been temporary." According to Hynix, whether the closure was temporary should be evaluated based on "what was known and knowable" as of December 31, 2008. Hynix reiterates that its employees were maintaining the operational capability of facility during late 2008 and that, as of December 31, 2008, options were available to Hynix that could have involved resumption of production at the plant. The Department responds that "`[o]n July 23, 2008, Hynix * * * announced it will be closing its facility located in West Eugene [,]'" and there is no evidence indicating that the closure was temporary. (Department's Reply at 5, citing Stip Ex B; Stip ¶ 4.) By contrast, the Department points to Hynix's actions during its 2001 temporary closure: Hynix announced its need to temporarily reduce employment, made arrangements to make the one-year "in lieu" payment, and specifically identified its time-frame for re-opening.
The court agrees with the Department that there is no evidence to support the conclusion that Hynix's closure was temporary. Hynix's March 31, 2009, letter to the County stated that Hynix announced on July 23, 2008, that it would be closing its West Eugene facility "due to *Page 24 
ongoing economic challenges in the semiconductor industry." (Stip Ex B.) That letter provided no indication that the closure would be temporary. (Id.) None of the actions taken by Hynix during 2008 suggested that the closure was temporary. For the foregoing reasons, Hynix did not qualify for the one-year "in lieu" payment under ORS 285C.240(6) in 2008.
5. Whether Hynix made an "in lieu" payment
The parties submitted additional arguments concerning whether Hynix's payment of "the entire amount of its 2009-10 Lane County property tax as billed" constituted an "in lieu" payment under ORS 285C.240(6) and whether Hynix previously used the "in lieu" provision in 2001 and was, therefore, ineligible to use it in 2008. (Department's Cross Mot at 20 (citations omitted); Hynix's Reply at 11.) The court does not find it necessary to address those arguments based on its conclusion that Hynix "closed its operations" under ORS 285C.240(6) in 2008.
F. Estoppel
The County, in its Answer and Affirmative Defenses to Amended Complaint, raised the affirmative defense of estoppel: "Plaintiff, having advised the assessor that it was `closing its facility in West Eugene' should be estopped to deny same here." (Id. at 3.) Because Hynix is not entitled to exemption for any of the periods at issue, the County's estoppel defense is moot.
G. Attorney Fees, Costs, and Disbursements
The County requested attorney fees under ORS 20.105, arguing that that "[t]he claims and arguments that [Hynix] makes in this case are not supported by law or fact. Nor does it make `reasonable argument for the extension, modification, or reversal of existing law[.]' These frivolous arguments are that there has been no closure, that taxpayer is now eligible for a lesser *Page 25 
payment, and that it has paid the zone sponsor in a manner which complies with the statute." (Reply to Plaintiff's Response Re: Summary Judgment at 8, citing Dept. of Rev. v. Croslin,19 OTR 69, 81 (2006).) The County requests that it "be allowed to prove its attorney fees by supplemental proceedings." (Id.) The Department requests "costs and disbursements and such other relief as may be deemed just and equitable." (Department's Answer to Am Compl at 2.)
ORS 20.105(1) states:
 "In any civil action, suit or other proceeding in a circuit court or the Oregon Tax Court, or in any civil appeal to or review by the Court of Appeals or Supreme Court, the court shall award reasonable attorney fees to a party against whom a claim, defense or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the court that the party willfully disobeyed a court order or that there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."
This court has determined that "a claim lacks an `objectively reasonable basis' when it is `entirely devoid of legal or factual support.'" PattonII v. Dept. of Rev. (Patton II),18 OTR 256, 259 (2005) (citations omitted). The applicable standard is whether "a reasonable lawyer would know that each of the arguments on appeal is not well grounded in fact or is not warranted either by existing law or by a reasonable argument for the extension, modification, or reversal of existing law." Id., at 261, citingMcCarthy v. Oregon Freeze Dry, Inc.,334 Or 77, 87, 46 P3d 721 (2002). "A nonprevailing party may completely avoid an award of attorney fees if, throughout the proceedings, even one claim, defense, or ground for appeal is warranted either by existing law or by a reasonable argument for the extension, modification, or reversal of existing law." Id. at 262, citing Seely v.Hanson, 317 Or 476, 484, 857 P2d 121 (1993). *Page 26 
The court in Patton II noted that "the magistrate's decision acts as a baseline against which to operate in determining what a reasonable attorney knew or should have known at the time the complaint was filed." Id. at 262; see also Dept. ofRev. v. Kelly, TC No 4829 (Order Granting Def's Pet for Att'y Fees, Costs, and Disbursements, Apr 2, 2010) (stating that "[t]he court has indicated that among the factors it will consider in applying this statute are the history of litigation in this court and whether a party that did not prevail in the Magistrate Division essentially relitigated a position in the Regular Division following a reasoned statement of law by a magistrate"). The court in Patton I v. Dept. of Rev., 18 OTR 111, 127 (2004), awarded attorney fees to the defendant, noting that the taxpayer's claims "were all inconsistent with statutory provisions and clear unequivocal prior holdings of this court." In the present case, there is no evidence of a prior reasoned decision or prior case law on the issues presented. For the foregoing reasons, the County's request for attorney fees under ORS 20.105 and the Department's request for costs, disbursements, and other such relief are hereby denied.
 III. CONCLUSION
After carefully considering the stipulated facts and the parties' arguments, the court concludes that Hynix closed its eligible operations in the enterprise zone in August 2008 and was not, therefore, entitled to enterprise zone exemption during the 2006-2008, 2007-2009, or 2008-2010 exemption periods. The court further concludes that Hynix "closed its operations" in 2008 within the meaning of ORS 285C.240(6) and was not, therefore, entitled to the one-year "in lieu" payment provision under that statute. Now, therefore,
IT IS DECIDED that Hynix's appeal of the 2006-2008, 2007-2009, and 2008-2010 enterprise zone disqualifications is denied; *Page 27 
IT IS FURTHER DECIDED the County's request for attorney fees under ORS 20.105 is denied; and
IT IS FURTHER DECIDED that the Department's request for costs, disbursements, and such other relief is denied.
Dated this ___ day of May 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on May 5, 2011. The Court filed and entered this documenton May 5, 2011.
[1] "Defendants do not stipulate to the facts set forth in * * * paragraph 10, but agree the Court may assume the truth of such facts for purposes of any summary judgment and/or partial summary judgment motion" filed by the parties. (Stip Facts at 5, ¶ 11.)
[2] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2007.
[3] The "employment of the firm" is defined in ORS 285C.200(7)(b)(A) as "[t]he number of employees working for the firm a majority of their time in eligible operations at locations within the enterprise zone[.]"
[4] The authorized agency was the Oregon Business Development Department beginning in 2010.
[5] That text appears in the 2007, 2008, 2009, and 2010 editions of OAR 123-065-4950.
[6] ORS 285C.135 states, in pertinent part, that:
 "(1) To be an eligible business firm, a business firm must be engaged, or proposing to engage, within the enterprise zone, in the business of providing goods, products or services to businesses or other organizations through activities including, but not limited to, manufacturing, assembly, fabrication, processing, shipping, or storage.
 "(2) A business firm is not an eligible business firm if the firm is:
 "(a) Engaged within the enterprise zone in the business of providing goods, products or services to the general public for personal or household use.
 "(b) Significantly engaged in a business activity within the enterprise zone that consists of retail sales or services, child care, housing, retail food service, health care, tourism, entertainment, financial services, professional services, leasing space to others, property management, construction or other similar activities, even if for another business or organization."
[7] The "use of a term in one section and not in another may indicate a purposeful omission." Jordan v. SAIF,343 Or 208, 217-18, 167 P3d 451 (2007) (citation omitted). *Page 1